620 A.2d 961

**Lawrence M. LEVINSON,**

v.

**MONTGOMERY COUNTY, Maryland.**

**No. 1051, Sept. Term, 1992.**

Court of Special Appeals of Maryland.

Feb. 26, 1993.

308

Dov Apfel (Hoffman, Apfel & Lyons, P.C., on the brief), Rockville, for appellant.

A. Katherine Hart, Sr. Asst. County Atty. (Joyce R. Stern, County Atty. and Karen L. Federman Henry, Associate County Atty., on the brief), Rockville, for appellee.

Argued before BISHOP, BLOOM and FISCHER, JJ.

BISHOP, Judge.

The Montgomery County Department of Environmental Protection (the "DEP") issued a notice of zoning violation (the "Notice") to Appellant, Lawrence M. Levinson, M.D. ("Dr. Levinson"). Dr. Levinson filed a notice of appeal with Appellee, the Montgomery County Board of Appeals (the "Board"). The Board conducted an evidentiary hearing and affirmed the Notice. Dr. Levinson then filed an appeal to

the Circuit Court for Montgomery County. Appellee, Montgomery County (the "County"), filed a motion to intervene. The circuit court granted the County's motion, and affirmed the decision of the Board. Dr. Levinson filed a timely notice of appeal to this Court.

### Issues

Appellant raises the following issues, which we restate as follows:

I. Whether a zoning ordinance that prohibits a home health practitioner from selling prescribed remedial devices that are available from a commercial source, without establishing specific criteria and standards for granting special exceptions or allowing sales that are compatible with the general welfare of the community as permitted uses, or both, is illegal, arbitrary, and capricious?

II. Whether a zoning ordinance that prohibits a home health practitioner from selling prescribed remedial devices that are available from a commercial source, without establishing specific criteria and standards for granting special exceptions or allowing sales that are compatible with the general welfare of the community as permitted uses, or both, deprives physicians of due process of law and equal protection of the laws, as guaranteed by the United States Constitution and the Maryland Declaration of Rights?

III. Whether Dr. Levinson acquired a vested right to sell commercially available eyeglasses?

IV. Whether the DEP is prevented, under the doctrine of equitable estoppel, from enforcing the Notice?

### Facts

The facts of this case are essentially undisputed. Dr. Levinson, an ophthalmologist, has maintained a private practice in Potomac, Maryland since 1975. Around 1981, Dr. Levinson added to his office an optical dispensary from

which eyeglasses were sold. The office was located in the Sovran Bank Building in Potomac Village. Sometime in 1990, however, Dr. Levinson moved his ophthalmology practice, including the optical dispensary, to the basement of his single-family residence in Potomac. Although the property is zoned "RE–2" (residential, one-family), the Montgomery County Code, § 59–A–6.1 (1984, as amended), permits a home health practitioner to maintain a professional office within his or her home, subject to certain requirements and restrictions.

Before moving his practice, Dr. Levinson submitted two building permit applications to the DEP. In the first application, dated November 22, 1989, he requested a permit to alter the existing structure for use as a basement professional office. In the second application, dated January 19, 1990, he requested a permit to construct a professional office. The applications were accompanied by floor plans, which indicated an area for an "Optical Shop." The DEP approved the applications on January 25 and 30, 1990, respectively. On January 29, 1990, Dr. Levinson submitted an application for a "Use and Occupancy Certificate," on which he listed as the proposed use: "PROFESSIONAL OPHTHALMOLOGY OFFICE DISPENSING GLASSES + CONTACT LENSES" (emphasis in original). The DEP approved the application and, on March 13, 1990, issued the certificate. The certificate specified the use as "Professional Office for resident of dwelling—Ophthalmology."

In August 1990, the West Montgomery County Citizens Association (the "Association") sent a letter of complaint to the DEP. The Association alleged that Dr. Levinson was selling, in his home, commercially available eyeglasses in violation of a County zoning ordinance. Section 59–A–6.1(c)(6) of the Montgomery County Code provides: "The sale of goods on the premises is prohibited, except for medication prescribed by the health practitioner or a prescribed remedial device *that cannot be obtained from a commercial source*" (emphasis added). In response to the complaint, Mark Moran ("Moran"), a County zoning inspector, visited Dr. Levinson's home, and confirmed the Associa-

tion's allegation. In a subsequent conversation with Moran, Dr. Levinson admitted that the eyeglasses he sold were available at commercial establishments. At the hearing, Dr. Levinson testified that, to the best of his knowledge, all eyeglasses are commercially available. Dr. Levinson gave his patients the option of purchasing glasses at his shop, or elsewhere. He neither advertised that he sold eyeglasses, nor filled other doctors' prescriptions.

The County Council adopted Section 59–A–6.1 on January 16, 1990 as part of a series of text amendments aimed at "minimizing the adverse impacts of non-residential uses in one-family residential zones and removing certain distinctions between types of occupations which no longer appeared to be valid." On February 5, 1990, the effective date of the text amendments, § 59–A–6.1(c)(6) replaced a similar provision contained in § 59–A–2.1, which provided in pertinent part:

> *Office, professional, residential:* Rooms and/or buildings used for office purposes by not more than one (1) member of any recognized profession ...; provided, that such use shall be incidental to and subordinate to residential use and *not one involving a commercial enterprise.* Such use shall preclude manufacturing or sale of any hardware product, except those remedial devices which are prescribed as a direct result of the specific service rendered on the premises *and which devices cannot be obtained by the client from any commercial establishment.*

(Emphasis added).

In October 1990, the DEP requested that the County Attorney provide an interpretation of § 59–A–6.1(c)(6). Moran testified that because the home occupation provisions of the zoning code were changed, the DEP wanted to confirm that, under the new text amendments, the sale of commercially available eyeglasses was prohibited. After receiving a memorandum from the County Attorney's office, which concluded that the sale of commercially available prescribed remedial devices by home health practitioners

was prohibited by the zoning ordinance, Moran issued the Notice directing Dr. Levinson, *inter alia,* to "[c]ease sale of prescribed remedial devices on the premises that may be obtained from a commercial source."

Dr. Levinson filed a notice of appeal to the Board. After an evidentiary hearing on August 14 and September 11, 1991, the Board affirmed the Notice and found that there was a "facial violation of an unambiguous ordinance." The Board determined that the doctrines of vested rights and equitable estoppel were inapplicable, but declined to pass on the constitutionality of the ordinance.

Dr. Levinson filed an appeal to the Circuit Court for Montgomery County. After hearing the arguments of counsel, the court affirmed the decision of the Board.

> The Court feels that although this is perhaps a close case, it is fair for the County to undertake to exclude commercial enterprise from a residential zone in general, and specifically when it does allow home offices, which really are of a commercial nature in a residential area.
>
> It can also restrict the extent of that practice, and whether it is the number of people that can visit, or the number of parking spaces or signs, or the kinds of products that can be sold from the premises. Those are all reasonably related to the health and welfare that the Council is mandated to try and promote.
>
> So, despite the interest, and there are obviously some issues that are going to be debated further on by perhaps other kinds of practitioners about just what the scope of this ordinance is, but for purposes of this specific case, I don't find that [Dr. Levinson's] positions are well taken.

Also, the court found, at least implicitly, that the doctrines of vested rights and equitable estoppel did not prevent the DEP from enforcing the Notice against Dr. Levinson.

Additional facts will be included, as necessary.

### Standard of Review

Article 25A, § 5(U) of the Annotated Code of Maryland (1990) provides in pertinent part:

> Any person aggrieved by the decision of the board [of appeals] and a party to the proceeding before it may appeal to the circuit court for the county which shall have power to affirm the decision of the board, or if such decision *is not in accordance with law,* to modify or reverse such decision, with or without remanding the case for rehearing as justice may require.

(Emphasis added). Generally, the determination of an administrative agency, such as the Board in the case *sub judice,* is entitled to great deference. Nevertheless, "[t]he Board's decision may be set aside as not in accordance with law if it is arbitrary, illegal or capricious." *Art Wood Enters. v. Wiseburg Community Assoc., Inc.,* 88 Md.App. 723, 727, 596 A.2d 712 (1991), *cert. denied,* 325 Md. 397, 601 A.2d 130 (1992). A decision of the Board is arbitrary, illegal, or capricious when it is not "supported by substantial evidence on the record taken as a whole." *Mortimer v. Howard Research & Dev. Corp.,* 83 Md.App. 432, 441, 575 A.2d 750, *cert. denied,* 321 Md. 164, 582 A.2d 499 (1990). Furthermore, "[w]here ... the [Board]'s decision is based on an erroneous conclusion of law, ... [t]he reviewing court ... may substitute its judgment for that of the [Board]...." *Mayor of Ocean City v. Purnell–Jarvis, Ltd.,* 86 Md.App. 390, 402, 586 A.2d 816 (1991).

"[T]he role of this court is essentially to repeat the task of the circuit court; that is, to be certain the circuit court did not err in its review." *Mortimer,* 83 Md.App. at 442, 575 A.2d 750. We shall also consider whether the circuit court's conclusion of law regarding the constitutionality of § 59–A–6.1(c)(6) was correct, because that question was considered there for the first time.

### Discussion

### I & II

Montgomery County "enjoys no inherent power to zone or rezone, and may exercise zoning power only to the

extent and in the manner directed by the State Legislature." *West Montgomery County Citizens Assoc. v. Maryland–Nat'l Capital Park & Planning Comm'n,* 309 Md. 183, 186, 522 A.2d 1328 (1987). The Regional District Act authorizes the County Council, sitting as district council, to "adopt and amend the text of the zoning ordinance … [in order] to regulate … the location and uses of buildings and structures and units therein for trade, industry, residence, recreation, agriculture, public activities, and other purposes…." Md.Ann.Code art. 28, § 8–101(b)(1) (1990). Section 8–101(b)(1) requires, at least implicitly, that the County Council carry out its delegated zoning powers for the "protection and promotion of the health, safety, morals, comfort, and welfare of the inhabitants of the [County]." *See id.* § 7–110. In deference to this legislative mandate, the County Council declared that:

> The zoning regulations set out in this chapter for that portion of the Maryland–Washington Regional District in the county are hereby adopted for the purpose of protecting and promoting the health, safety, morals, comfort and welfare of the present and future inhabitants of the district….

Montgomery County Code, § 59–A–1.1 (1984, as amended).

Dr. Levinson first contends that the prohibition of the sale of commercially available prescribed remedial devices under § 59–A–6.1(c)(6) does not bear a substantial relation to the protection and promotion of the health, safety, morals, and general welfare of the County's inhabitants. He argues that there is no reason for the County to assume that the sale of eyeglasses will have an adverse impact on the community, and therefore, the County's decision to ban the sale, in advance, was arbitrary, discriminatory, and not rationally related to a lawful objective. Dr. Levinson points to the fact that § 59–A–6.1(c)(3) already limits the vehicle traffic to and from his office; thus, selling eyeglasses to existing patients would not increase traffic, parking, or other problems. Dr. Levinson also argues that the County could provide for special exceptions, thereby allowing the

Board to decide, on a case-by-case basis, whether such prohibition is necessary. Further, Dr. Levinson compares § 59–A–6.1(c)(6) to § 59–A–6.1(b)(4), a similar provision that applies to all home occupations other than the home health practitioner. Section 59–A–6.1(b)(4) provides in pertinent part:

The sale of goods on the premises is prohibited, except for:

(A) The products of dressmaking, hand-weaving, block-printing, the making of jewelry, pottery or musical instruments by hand, or similar arts or handicrafts performed by a resident of the dwelling....

He argues that there are no facts or valid reasons to justify the distinctions made by the Council between selling jewelry and selling eyeglasses, or between seeing a patient and selling prescribed eyeglasses to that patient.

Dr. Levinson further contends that § 59–A–6.1(c)(6) denies him due process of law. He suggests that the ordinance creates an "irrebuttable presumption" by unconditionally and permanently banning all sales of remedial devices that are available from a commercial source, without giving him procedural due process, i.e., an opportunity to obtain a special exception, or to present facts to establish that the sale of eyeglasses is consistent with the legislative purpose. He argues that the ordinance has no standards or criteria for granting a special exception or allowing the sale as an incidental or related use. He again points to the fact that § 59–A–6.1(c)(3) limits the amount of vehicle traffic to and from his office, yet he is nevertheless prohibited from selling commercially available prescribed remedial devices, and asserts that, without a meaningful opportunity to show that there is no impact, and without standards to guide the DEP in enforcing the regulation, an unconstitutional deprivation of a property right results.

Dr. Levinson also argues that he has been denied equal protection of the laws because he is prohibited from selling eyeglasses while those in other home occupations can sell jewelry and handbags. He contends that the County offers

no justification for its distinctions, and therefore, the County has failed to provide the rational basis needed to justify unequal treatment.

Although Dr. Levinson attacks both the validity and constitutionality of § 59–A–6.1(c)(6), the former is essentially a component of the latter. Put another way, the validity of the ordinance as a proper exercise of the County's delegated police power hinges on whether it violates notions of substantive or procedural due process, or equal protection of the laws, under either Article 24 of the Maryland Declaration of Rights or the Fourteenth Amendment to the United States Constitution. Because many of Dr. Levinson's contentions are interrelated, or based on the same or similar standard of review, or both, we shall address them together.

First, we shall consider whether § 59–A–6.1(c)(6) offends notions of substantive due process under either Article 24 or the Fourteenth Amendment. Under the latter, the validity of a zoning ordinance that does not involve a fundamental right or suspect classification

> generally is said to be determined by the so-called "minimum rationality" test. Under this test, the objective of a given piece of legislation is usually conceded to be valid, and the focus of inquiry is instead on whether the means adopted are reasonably calculated to achieve that objective—a criterion which is satisfied by any conceivable, rational basis in fact or logic linking regulation with its intended objective or purpose.

1 Arden H. and Daren A. Rathkopf, *The Law of Zoning and Planning* § 3.04[4] (1992) (footnotes omitted). Many state courts, however, have "indicated a much greater willingness than their federal counterparts to find that as a matter of due process a zoning restriction is arbitrary and unreasonable." *Id.* § 3.04[5]. Accordingly,

> [s]tate courts, either explicitly or implicitly, tend to hold that due process requires some "real and substantial relationship" to a legitimate public purpose for regulation to be valid. While in theory this due process standard is

similar to the "minimum rationality" test, in its actual application state courts may give less deference to legislative judgment and hold invalid zoning restrictions only tangentially related to the public welfare or found to be unduly oppressive, fundamentally unfair, or overinclusive or underinclusive in their impact.

*Id.*

In *Goldman v. Crowther*, 147 Md. 282, 293, 128 A. 50 (1925), an early case in which the Court of Appeals undertook to review the validity of a Baltimore City zoning ordinance, the Court recognized that Maryland "courts have uniformly held that the police power is not unlimited, but that wherever it is invoked in aid of any purpose or legislation, such purpose or legislation must bear some *definite and tangible relation* to the health, comfort, morals, welfare, or safety of the public ..." (emphasis added). The Court also noted that "any exercise of the [police] power which interferes with some right protected by the letter of the Constitution must bear some *substantial relation* to the public health, morals, safety, comfort or welfare." *Id.* at 295, 128 A. 50 (emphasis added).

In *Mayor of Pocomoke City v. Standard Oil Co.*, 162 Md. 368, 376–77, 159 A. 902 (1932), the Court of Appeals, in sustaining an ordinance that prohibited any filling station within a specified congested area, said that where a subordinate agency of the state, such as a municipal corporation, acts directly in such exercise of the police power, "the only limitation upon its right to exercise the power is that it must act *impartially*, that any interference by it with the unrestricted use of private property must be *reasonably necessary* to the public welfare, and consistent with the prohibitions of the Constitution" (emphasis added). The Court then recited several "settled" principles applicable to consideration of the

> validity of legislative and governmental acts imposing building and use restrictions upon real property ...: (1) That restrictions imposed by the State or some agency of the State upon the use of private property cannot be

justified under the police power unless they are *reasonably necessary* for the adequate protection of the public welfare, safety, health, comfort, or morals; (2) that whether such restrictions are reasonable in fact is a judicial question; (3) that when imposed by competent legislative authority the burden of proof in any such inquiry is upon him who challenges their validity; and (4), when they are *reasonably necessary* for the adequate protection of the public welfare, safety, health, morals, or comfort, such restrictions will be regarded as a valid exercise of the police power unless they contravene some express constitutional prohibition.

*Id.* at 379–80, 159 A. 902 (emphasis added) (citations omitted). Furthermore, in *City of Baltimore v. Cohn,* 204 Md. 523, 530, 105 A.2d 482 (1954), the Court explained that

the governmental power to interfere by zoning regulations with the general rights of the landowner by restricting the character of the use of his land is not unlimited, and such restriction cannot be imposed if it does not bear *a substantial relation* to the public health, safety, morals, or general welfare. Legislative bodies have no authority, under the guise of the police power, to impose *unreasonable and unnecessary* restrictions on the use of private property in pursuit of useful activities.

(Emphasis added); *see also Norbeck Village Joint Venture v. Montgomery County Council,* 254 Md. 59, 66, 254 A.2d 700 (1969) ("The broad test of the validity of a comprehensive rezoning is whether it bears a *substantial relationship* to the public health, comfort, order, safety, convenience, morals and general welfare, and such zoning enjoys a strong presumption of validity and correctness" (emphasis added).).

[4–6] Viewing the standards espoused in *Goldman, Standard Oil Co.,* and *Cohn* together, we conclude that Maryland courts employ, like many other states, a heightened level of scrutiny—something over and above the "minimum rationality" test required under the federal constitution. Although almost any zoning ordinance could be said

to be rationally related to a legitimate governmental interest, *but see City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), the "substantial relationship" test is not so yielding. Despite the heightened level of review, § 59–A–6.1(c)(6) is presumed to be constitutional. *See Lucky Stores, Inc. v. Board of Appeals*, 270 Md. 513, 526, 312 A.2d 758 (1973). "[T]he burden is upon [Dr. Levinson] to establish clearly that it is unconstitutional." *Id.; see Standard Oil Co.*, 162 Md. at 380, 159 A. 902. We conclude that Dr. Levinson has failed to meet this burden. Section 59–A–6.1(c)(6) is substantially related to the promotion and protection of the community's health, safety, comfort, morals, and general welfare. It is a reasonable and necessary means to an end—the preservation of the residential nature of a residentially zoned district, and the provision of adequate fire protection. We explain.

"That the right to hold, enjoy and use property is not absolute but subject to the police power of the State is axiomatic...." *Goldman*, 147 Md. at 302, 128 A. 50. It goes without saying that "[a]ll zoning ordinances permit accessory uses in residential districts...." 2 Robert M. Anderson, *American Law of Zoning* § 13.02 (3d ed. 1986). The County's zoning ordinance explicitly permits the operation of home occupations in general, and offices for home health practitioners in particular. Nevertheless, "zoning ordinances today that allow [such] accessory uses often impose specific restrictions...." 2 Rathkopf, *supra*, § 23.-04[2]. The County's ordinance is no exception.

> These varied limitations upon home occupations and the conditions under which they may be maintained have a common denominator in their purpose to minimize the impact of home occupations upon their immediate neighbors. They represent a political compromise between the purpose of zoning to remove incompatible commercial use from residential districts, and the social necessity of

permitting some of the traditional home occupations to continue.

Anderson, *supra*, § 13.02.

Zoning ordinances which permit home occupations commonly discourage the operation of a store, or the sale of merchandise. Some prohibit the keeping of a stock in trade. Others outlaw the sale of any commodity. A lesser restriction, which emphasizes the aesthetic aspects of a commercial activity in a residential neighborhood, provides that "no display of products shall be visible from the street and only articles made on the premises may be sold on the premises."

*Id.* § 13.24 (*quoting* Charlotte, North Carolina, Zoning Ordinance § 23–32.1(h) (1973)) (footnotes omitted).

In the case *sub judice*, Dr. Levinson argues that he should be permitted to conduct what is essentially a commercial enterprise. Although any home occupation is necessarily commercial in nature, the County Council has presumably engaged in a careful balancing process in order to determine which accessory uses should be permitted and what restrictions need be imposed. *See Schultz v. Pritts*, 291 Md. 1, 21, 432 A.2d 1319 (1981).

A fundamental purpose of zoning, justified because of its reasonable relationship to the promotion of the public welfare, health and safety, is the preservation of the character of a neighborhood by excluding new uses and structures prejudicial to the restricted character of the area.... Zoning regulations which preserve neighborhood characteristics stabilize the value of property, promote the permanency of desirable home surroundings and add to the happiness and comfort of citizens.

8 Eugene McQuillin, *The Law of Municipal Corporations* § 25.24 (3d ed. rev. vol. 1991) (footnotes omitted). Indeed, in *Village of Belle Terre v. Boraas*, 416 U.S. 1, 9, 94 S.Ct. 1536, 1541, 39 L.Ed.2d 797 (1974), Mr. Justice Douglas noted:

A quiet place where yards are wide, people few, and motor vehicles restricted are legitimate guidelines in a land-use project addressed to family needs. This goal is a permissible one.... The police power is not confined to elimination of filth, stench, and unhealthy places. It is ample to lay out zones where family values, youth values, and the blessings of quiet seclusion and clear air make the area a sanctuary for people.

Dr. Levinson argues that the restriction contained in § 59–A–6.1(c)(6) is unreasonable and not substantially related to any valid purpose because, in his particular case, the sale of eyeglasses to existing patients would not increase traffic in the area, create parking problems, or bring about other evils that zoning laws are designed to prevent. Dr. Levinson also contends that the restriction in § 59–A–6.1(c)(3) is sufficient to prevent the residential quality of the neighborhood from deteriorating. Section 59–A–6.1(c)(3) provides:

> The home health practitioner(s) may be allowed to treat more than one patient or client at a time, provided that this does not result in more than 5 vehicle trips containing not more than 10 patients arriving or departing at the same appointment time.

■ "It is recognized that although a zoning ordinance is not invalid per se, yet when the provisions of such an ordinance come to be applied to particular premises, it may be found to be clearly arbitrary and unreasonable." *Cohn,* 204 Md. at 530, 105 A.2d 482. Such is not the case here, however. Legislatures are frequently called upon to draw lines when determining which restrictions on accessory uses are necessary to promote the community's general welfare. *See generally McBriety v. Mayor of Baltimore,* 219 Md. 223, 235, 148 A.2d 408 (1959). This Court will only interfere with this purely legislative function when the line is drawn unreasonably.

By allowing home occupations generally, and the office of a home health practitioner in particular, in single-family residences, the County Council obviously considered: 1) the

benefit the accessory use would have to the homeowner, and 2) the benefit the accessory use would have to the community by increasing its residents' access to health care, for example. At the same time, however, the County Council was apparently concerned that allowing these accessory uses could open Pandora's Box. Accordingly, the County Council prohibited the sale of all goods, except: medicine and prescribed remedial devices that are not commercially available (by a home health practitioner), and handmade works of art or craft (by all others who engage in a home occupation).

In *Sinoway v. Village of S. Orange,* 104 N.J.Super. 477, 250 A.2d 429 (App.Div.1969), the New Jersey Superior Court, Appellate Division held that a zoning ordinance that allowed a home office in the residence of a physician or dentist, but not an optometrist, had a reasonable basis and was, therefore, not repugnant to the Fourteenth Amendment to the United States Constitution. Although the court reviewed a zoning ordinance unlike the one *sub judice,* and decided the case on federal constitutional grounds, the court made several noteworthy comments.

South Orange is generally a high-class residential community, especially in its "Residence A" zone. The village trustees could justifiably limit the invasion of this residential area for office use in one's actual place of residence to the exceptional cases of doctors of medicine and dentistry. Their need is frequently required in emergency situations on short notice. Their ready availability is important to the health and welfare of the community. They sell no merchandise.

Optometrists, concerned generally with measuring the acuity of the eye, are rarely faced with emergencies. They are more involved in the fitting and sale of spectacles, besides their other functions of measuring the powers of vision to ascertain any departure from the normal.

*Id.* 250 A.2d at 430–31.

Unlike the South Orange ordinance, the County's ordinance allows a home office not only for physicians and

dentists, but also for most other health care practitioners. In addition, another subsection of § 59–A–6.1 allows homeowners to maintain a home office for other occupations that provide a service or product. It is clear that the County Council did not attempt to restrict the extent to which home occupations are considered accessory uses. The County Council did, however, limit the extent to which goods could be sold, presumably to prevent a home office from being transformed into more of a commercial enterprise than necessary. The County Council could have reasonably concluded that a home occupation is a legitimate accessory use in a residentially zoned district, but the sale of commercially available goods is not.

Dr. Levinson nevertheless argues that he should not be prevented from selling commercially available eyeglasses where, for example, under § 59–A–6.1(b)(4)(A), jewelers can sell jewelry. What Dr. Levinson fails to appreciate, however, is that the sale of goods under § 59–A–6.1(b)(4)(A) is limited to handmade works of art or craft, which are generally one-of-a-kind items not readily available from a commercial source. The County Council limited the sale of goods by all who engage in a home occupation. In other words, the general rule is that *no goods* may be sold from a home occupation or by a home health practitioner. The County Council carved several narrow exceptions consistent with what it believed to be reasonably necessary for the general welfare of the community. The County Council might have determined that the sale of goods was generally inconsistent with the character of a residential neighborhood, but concluded that medicine, prescribed remedial devices that are not commercially available, and hand-made objects of art or craft should be available for sale despite their commercial nature.

Dr. Levinson contends that, because the limitation in § 59–A–6.1(c)(3) is adequate to restrict traffic flow, and thereby preserve the residential nature of the community, § 59–A–6.1(c)(6) contains an unnecessary and unreasonable limitation, and is unduly restrictive in its application. If

this Court, however, were to declare § 59–A–6.1(c)(6) unconstitutional on that basis, the floodgates would open to receive endless litigation. Jewelers, for example, who can maintain a home office under § 59–A–6.1(b), would march into court for the purpose of having § 59–A–6.1(b)(4)(A) declared unconstitutional. They would argue that they should be able to sell commercially available jewelry because § 59–A–6.1(b)(3) already restricts the number of customer visits to twenty per week (and five per day) and the sale of stock jewelry in addition to hand-made jewelry would not have a negative impact on the residential nature of the community. If this were to happen, an optician would be permitted to operate a home business and to sell eyeglasses and contact lenses prescribed by an optometrist or ophthalmologist, provided no more than twenty customers per week and five customers per day are serviced. Any commercial enterprise could establish an outpost in a residential district under the guise of a home occupation, provided it conforms to the general requirements of § 59–A–6.1, and does not otherwise run afoul of § 59–A–6.1's limitations.

Section 59–A–6.1(c)(6) also bears a substantial relation to the promotion and protection of the safety of the County's inhabitants. The County Council could have reasonably concluded that § 59–A–6.1(c)(6) was necessary to reduce the risk and severity of fire. Commercial enterprises that sell stock merchandise often keep in storage extra stock. It is likely that the goods are kept in combustible containers, or are combustible themselves. The County Council could have concluded that along with the sale of commercially available goods would be the storage of those goods, and that this would pose a greater fire hazard than should be tolerated in a residential area. This bears a substantial relation to the safety of the home's occupants and their neighbors. It also adds some sense of predictability and uniformity so that the County can provide suitable fire protection.

Dr. Levinson cites *Aspen Hill Venture v. Montgomery County Council*, 265 Md. 303, 289 A.2d 303 (1972), for the proposition that zoning officials may not consider "need" or substitute their economic judgment for property owners' or the public's. In that case, the appellant owned residentially zoned land that he wished to use for the expansion of an existing shopping center. The appellant filed a zoning application with the District Council seeking reclassification of the property from residential to commercial. A hearing examiner determined that:

> (1) there was sufficient change in the character of the neighborhood to justify rezoning, (2) the proposed reclassification was in accordance with "the recently adopted Aspen Hill and Vicinity Master Plan," and (3) the proposed reclassification would not have an adverse effect upon the surrounding residential property or create traffic circulation problems or an additional nuisance factor in the area.

*Id.* at 306–07, 289 A.2d 303. Despite those findings, the hearing examiner recommended denial of the application because there was a " 'demonstrated lack of public need for additional commercial facilities at the subject site to service residents of the area.' " *Id.* at 307, 289 A.2d 303. The District Council followed the hearing examiner's recommendation and denied appellant's application.

The Court of Appeals was asked to decide "whether, absent a statutory mandate such as is usually required in cases of special exceptions, a 'lack of need' may be the sole basis for the rejection of a zoning reclassification." *Id.* at 313, 289 A.2d 303. The Court recognized first that " 'the constitutionality and validity of zoning laws depend essentially upon a reasonable balancing of public interest in zoning as against opposing private interests in property.' " *Id.* (*quoting* McQuillin, *supra*, § 25.40). The Court then held that "[t]he legislative decision to refuse to grant the requested rezoning ... [did] not ... bear a sufficient relation to the public welfare to be supported as a valid enact-

ment of the police power when balanced against the rights of the property owner." *Id.* (citation omitted).

In the case *sub judice,* Dr. Levinson is not attempting to have the subject property rezoned as commercial. He is arguing that selling commercially available eyeglasses should be permitted in a *residential* neighborhood as an accessory use. Unlike the subject property in *Aspen Hill Venture,* Dr. Levinson's home is in a residential neighborhood that presumably has *not* changed in character. If it has, Dr. Levinson should follow the appropriate procedure to have his property rezoned. Furthermore, even if "lack of need" played some part in the decision of the County Council to prohibit the sale of commercially available prescribed remedial devices, that was not the sole factor it considered. As discussed *supra,* preserving the residential nature of the neighborhood and promoting the safety of homeowners and neighbors likely played a substantial part in its decision. *Aspen Hill Venture* is, therefore, inapposite.

■ The next stage of Dr. Levinson's attack on the validity of § 59–A–6.1(c)(6) is based on the fact that there is no mechanism by which he can obtain a special exception for the sale of commercially available prescribed remedial devices. He argues that

[w]hen the County Council unconditionally banned the sale of commercially available prescribed remedial devices, it usurped the Board's administrative function to use its expertise and judgment to determine whether a special exception use should have been granted for the sale of such eyeglasses by Dr. Levinson.... The Board, and not the Council, should make the requisite findings that the sale of prescribed remedial devices in a particular case will adversely impact on surrounding neighborhoods.

Dr. Levinson cites *Creative Country Day Sch., Inc. v. Montgomery County Board of Appeals,* 242 Md. 552, 219 A.2d 789 (1966), and *Schultz v. Pritts,* 291 Md. 1, 432 A.2d 1319 (1981), to support his position. We do not find, in

these cases, any support for the proposition that the County Council *must* provide for special exceptions. In fact, the statutory authority for granting special exceptions to zoning regulations clearly provides that such mechanism is permissive, not mandatory.

> A district council in either county, in its zoning regulations, *may* provide that the board of zoning appeals, the district council, or an administrative office or agency designated by the district council, *in appropriate cases* and subject to appropriate principles, standards, rules, conditions, and safeguards set forth in the regulations, may either grant or deny, upon conditions as may be deemed necessary to carry out the purposes of this article, special exceptions and variances to the provisions of the zoning regulations in harmony with their general purposes and intent.

Md.Ann.Code art. 28, § 8–110 (Supp.1992) (emphasis added). Furthermore, in *Schultz,* the Court stated that "[w]hen the legislative body *determines that other uses are compatible with the permitted uses in a use district,* but that the beneficial purposes such other uses serve do not outweigh their possible adverse effect, such uses are designated as conditional or special exception uses." 291 Md. at 21, 432 A.2d 1319. As discussed *supra,* the County Council presumably determined that the sale of commercially available goods *is not compatible* with other permitted uses in a residential district. As long as this determination is reasonable and substantially related to the promotion and protection of the general welfare of the community, it will be sustained.

■ Dr. Levinson also argues that the County Council improperly relied on an irrebuttable presumption when it enacted § 59–A–6.1(c)(6) and that this denies him procedural due process of law. Once again, Dr. Levinson complains that he has not been given the opportunity to obtain a special exception, or to present facts, either to the DEP or the Board, to establish that the sale of eyeglasses is consistent with the legislative purpose. Dr. Levinson cites *Schad*

*v. Borough of Mount Ephraim,* 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981), *Cleveland Board of Educ. v. LaFleur,* 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974), and *Vlandis v. Kline,* 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973), to support his position.

In *Sun Oil Co. v. Goldstein,* 453 F.Supp. 787 (D.Md. 1978), *aff'd,* 594 F.2d 859 (4th Cir.1979), the Court discussed the law of irrebuttable presumptions. The Court recognized that "certain irrebuttable presumptions are invalid where the facts assumed are not universally true, and where no opportunity for a hearing of individual cases is established. 'Statutes creating permanent irrebuttable presumptions have long been disfavored under the Due Process Clauses of the Fifth and Fourteenth Amendments.'" *Id.* at 795 (*quoting Vlandis,* 412 U.S. at 446, 93 S.Ct. at 2233) (citation omitted). But the Court then identified the crucial point—that "the prevailing test is one of reasonableness." *Id.* at 796. "[D]ue process of law does not require a hearing 'in every conceivable case of government impairment of private interest.'" *Stanley v. Illinois,* 405 U.S. 645, 650, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972) (*quoting Cafeteria & Restaurant Workers Union v. McElroy,* 367 U.S. 886, 894, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961)). "'[W]hat procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the governmental function involved as well as of the private interest that has been affected by governmental action.'" *Id.* 405 U.S. at 650–51, 92 S.Ct. at 1212 (*quoting McElroy,* 367 U.S. at 895, 81 S.Ct. at 1748).

"One of the main distinctions between [*Schad, LaFleur,* and *Vlandis* ] and the instant case is that the factual situations there delineated the need for administrative hearing procedures." *Goldstein,* 453 F.Supp. at 796. Here, however, the County Council determined that the sale of all commercially available prescribed remedial devices in a residential use district is inconsistent with the general welfare of the community. Furthermore, of the cases Dr. Levinson cites, only *Schad* addresses a zoning ordinance, and in that

case, the ordinance impaired a fundamental right—freedom of expression under the First Amendment. *See Schad*, 452 U.S. at 68, 101 S.Ct. at 2182. Here, the ordinance regulates merely an economic interest, and is not entitled to the same level of scrutiny as the ordinance in *Schad*. Therefore, "[t]he facts here are not compatible with those dictating administrative hearings[,]" 453 F.Supp. at 796, and due process does not require notice and hearing. If this Court were to invalidate § 59–A–6.1(c)(6) on procedural due process grounds, we would usurp the legislative function of the County Council and no doubt open the door to an attack on many other valid zoning provisions.

 Dr. Levinson also argues that § 59–A–6.1(c)(6) deprives him of his right to the equal protection of the laws.

> [I]f a person seeks to rely upon the denial of the equal protection of the laws, that person has the burden of showing that his situation is the same as the situation complained of, and that the State, or its instrumentalities has treated the two situations differently in an unreasonable or arbitrary manner.

*Creative Country Day Sch., Inc.*, 242 Md. at 572, 219 A.2d 789. Dr. Levinson contends that the County Council does not have a rational basis for permitting the sale of jewelry and other goods under § 59–A–6.1(b)(4)(A), while at the same time prohibiting the sale of commercially available prescribed remedial devices under § 59–A–6.1(c)(6).

We hold that § 59–A–6.1(c)(6) does not violate the Equal Protection Clause of the Fourteenth Amendment or the equal protection guarantee embodied in Article 24 of the Maryland Declaration of Rights. Dr. Levinson has failed to prove that he is treated any differently than those with home occupations under § 59–A–6.1(b). As discussed *supra*, § 59–A–6.1(b)(4) prohibits the sale of goods on the premises of a home occupation. Only hand-made works of art or craft, generally "one-of-a-kind" items that are not commercially available, may be sold. This is consistent with the prohibition in § 59–A–6.1(c)(6) of the sale of pre-

scribed remedial devices except those that are commercially available. The fact that Dr. Levinson only offers goods that are commercially available is of no consequence. He is not treated any differently than a person with a home occupation. If Dr. Levinson were to dispense prescribed remedial devices that were not commercially available, this use would be clearly permissible.

## III & IV

Dr. Levinson also contends that the doctrines of vested rights and equitable estoppel bar the County from enforcing the Notice. We hold that neither doctrine applies.

 Maryland courts have adopted the majority rule that a

> "landowner will be held to have acquired a vested right to continue construction of a building or structure and to initiate and continue a use despite a restriction contained in an ordinance where, *prior to the effective date of the ordinance,* in reliance upon a permit theretofore validly issued, he has, in good faith, made a substantial change of position in relation to the land, made substantial expenditures, or has incurred substantial obligations."

*Prince George's County v. Equitable Trust Co.,* 44 Md. App. 272, 278–79, 408 A.2d 737 (1979) (*quoting* 3 A. Rathkopf, *The Law of Zoning and Planning* ch. 57–6.57–7 (3d ed. 1972)) (emphasis added); *see also Steuart Petroleum Co. v. Board of County Comm'rs,* 276 Md. 435, 443, 347 A.2d 854 (1975). The doctrine of vested rights,

> which has a constitutional foundation, rests upon the legal theory that when a property owner obtains a lawful building permit, commences to build in good faith, and completes substantial construction on the property, his right to complete and use that structure cannot be affected by any *subsequent change* of the applicable building or zoning regulations.

*Equitable Trust Co.,* 44 Md.App. at 278, 408 A.2d 737 (emphasis added).

In the case *sub judice*, there was no "subsequent change" in the zoning law after Dr. Levinson obtained his building and use and occupancy permits and completed construction of his Optical Shop. At the time the DEP issued the building permits, § 59–A–2.1 provided, in pertinent part:

> *Office, professional, residential:* Rooms and/or buildings used for office purposes by not more than one (1) member of any recognized profession ...; provided, that such use shall be incidental to and subordinate to residential use and *not one involving a commercial enterprise.* Such use shall preclude manufacturing or sale of any hardware product, except those remedial devices which are prescribed as a direct result of the specific service rendered on the premises *and which devices cannot be obtained by the client from any commercial establishment.*

(Emphasis added). Although this provision was later removed from § 59–A–2.1, it was transferred to § 59–A–6.1(c)(6), in a substantively unaltered form. Put another way, the applicable zoning ordinance effective both before and after the DEP granted Dr. Levinson building and use and occupancy permits prohibited him from selling commercially available prescribed remedial devices. The mere recodification and rewording of this provision does not amount to a "subsequent change" in the law. Therefore, we agree with the conclusion of both the Board and the circuit court that the doctrine of vested rights does not apply.

██ We also agree that equitable estoppel does not bar the County from enforcing the Notice.

> "Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might have otherwise existed, either of property, or contract or of remedy, as against another person who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse and who on his part

acquires some corresponding right, either of property, of contract, or of remedy."

*Savonis v. Burke*, 241 Md. 316, 319, 216 A.2d 521 (1966) (*quoting* 3 J. Pomeroy, *Equity Jurisprudence*, § 804 (5th ed. 1941)); *see also Salisbury Beauty Sch. v. State Bd. of Cosmetologists*, 268 Md. 32, 62, 300 A.2d 367 (1973). With few narrow exceptions, the general rule is that "estoppel cannot successfully be invoked against municipal authorities based on zoning actions." *National Insts. of Health Fed. Credit Union v. Hawk*, 47 Md.App. 189, 201, 422 A.2d 55 (1980). Recently, in *Permanent Fin. Corp. v. Montgomery County*, 308 Md. 239, 518 A.2d 123 (1986), the Court of Appeals reviewed the law of equitable estoppel in the zoning arena. Dr. Levinson contends that the facts *sub judice* fit within the holding of that case. We disagree.

In *Permanent Fin. Corp.*, a developer undertook construction of an office building pursuant to a building permit issued by the County. "Eight and one-half months and more than two million dollars later ..., the County suspended the building permit and issued a stop work order on the grounds that the building violated statutory height limitations, set-back requirements, and floor area ratio restrictions." *Id.* at 241–42, 518 A.2d 123. The Board, the circuit court, and this Court each denied relief from the suspension and stop work order. The Court of Appeals, however, held that the doctrine of equitable estoppel was applicable.

The Court quoted Judge Prescott, who in *Town of Berwyn Heights v. Rogers*, 228 Md. 271, 279–80, 179 A.2d 712 (1962), summarized the applicable principles of law when the doctrine of equitable estoppel is asserted against a municipal corporation.

"Some authorities hold that the principle of estoppel does not apply against a city, but the majority rule is to the effect that the doctrine of estoppel in pais is applied to municipal, as well as to private, corporations and individuals at least where the acts of its officers are within the scope of their authority and justice and right require that the public be estopped.... And it has been held that

municipalities may be estopped by reason of the issuance of permits.... However, the cases and text writers very generally state that a municipality is not estopped to set up the illegality of a permit.... And the issuance of an illegal permit creates no 'vested rights' in the permittee.... (citations omitted)."

308 Md. at 249, 518 A.2d 123. The Court then distinguished the case from *City of Hagerstown v. Long Meadow Shopping Ctr.*, 264 Md. 481, 493, 287 A.2d 242 (1972), where the Court held:

Nor do we think the facts of this case permit the successful use of the argument that the Building Inspector was following a long standing administrative interpretation when he informed Callas and Long Meadow that no building permit was required. This rule, when applicable, must be bottomed on the need for the interpretation or clarification of an ambiguous statute or ordinance, which latter element is not here present.

The Court concluded that the definition of a term in the County's zoning ordinance "was open to at least two reasonable and debatable interpretations[,] ... that the County shared the interpretation given this section by Permanent at the time of the issuance of the building permit, and that the County had consistently applied that interpretation for a significant period of time prior thereto." *Id.*

In the case *sub judice*, § 59–A–6.1(c)(6) is not "open to at least two reasonable and debatable interpretations." It may be that the Board will have to determine exactly what "commercial source" means in a future "borderline" case, but there is no question that, in the instant case, eyeglasses sold by Dr. Levinson are readily available from a commercial source. The plain language of the ordinance clearly forbids the sale of eyeglasses that may be purchased at a retail establishment.

Furthermore, Dr. Levinson failed to produce sufficient evidence before the Board to establish that the County had consistently applied a different interpretation to the ordinance. Dr. Levinson makes much of the fact that agents of

the DEP led him to believe that he could sell eyeglasses and that the DEP requested the opinion of the County Attorney as to the applicability of the ordinance to Dr. Levinson. At most, Dr. Levinson proved that the County had some question concerning the applicability of § 59–A–2.1 and was unclear whether § 59–A–6.1(c)(6) changed the law in any relevant respect.

Dr. Levinson also refers us to language in the County Attorney's memorandum:

> It is my opinion that to the extent that the sale of prescribed medical devices *was permitted as a customary and incidental use to a residential medical practice*, that the change to the law by the Home Occupation Text Amendment has resulted in a prohibition of the sale of goods on the premises except as permitted by § 59–A–6.1(c)(6) of the Zoning Ordinance.

(Emphasis added). This language, however, does not indicate that the County had a long standing administrative interpretation contrary to the plain meaning of the ordinance. The County Attorney merely said *"to the extent"* the prior use was permitted, it is clear that use is now prohibited.

We hold that this case more closely resembles *City of Hagerstown v. Long Meadow, supra.* "We ... recognize the hardship presented by this case, however, we are faced with the realization that to [reverse] the decision of the [Board and circuit court] below would unsettle a principle of law which has become stabilized in this jurisdiction by application in many cases." *City of Hagerstown,* 264 Md. at 493, 287 A.2d 242.

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.